IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| KEYBANK NATIONAL ASSOCIATION, ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | |
| ) | CASE NO. CV 04-296-S-MHW |
| RUIZ FOOD PRODUCTS, INC., a ) | |
| a California corporation; WELLS DAIRY ) | |
| INC., a New York corporation, dba ) | |
| GOOD HUMOR-BREYERS ICE CREAM ) | |
| LLC, Delaware limited liability company ) | **MEMORANDUM DECISION** |
| dba CASCADE GLACIER ICE CREAM ) | **AND ORDER** |
| LLC and/or dba CASCADE DISPENSING ) | |
| SYSTEMS, ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

## INTRODUCTION

Plaintiff KeyBank National Association ("KeyBank") filed a complaint in state court against Ruiz Food Products, Inc., CONOPCO, dba Good Humor-Breyers Ice Cream; and Oregon Ice Cream, LLC, dba Cascade Glacier Ice Cream LLC and/or dba Cascade Dispensing Systems (collectively, the "Defendants"). Defendants filed a Notice of Removal, June 10, 2004, in the United District Court for the District of Idaho. Each of Defendants were vendors selling frozen food products to Pioneer Distributing, Inc., an Idaho corporation ("PDI"). PDI executed several promissory notes in favor of KeyBank.

This controversy involves a dispute over the right to proceeds from the sale of PDI's inventory.  KeyBank alleges that PDI wrongfully diverted the proceeds of its accounts receivable to Defendants in order to obtain additional inventory from Defendants for a new company formed by PDI's owners.  KeyBank further alleges that PDI formed the new company in order to "cleanse" the proceeds of KeyBank's security interest.

Currently pending before the Court for its consideration are: (1) Defendants' Motion for Summary Judgment (Docket No. 24), filed May 25, 2005; and (2) Key Banks' Motion for Summary Judgment (Docket No. 31), filed on May 25, 2005.  Having heard oral argument on July 28, 2005, and having  reviewed all the relevant papers, the Court will grant summary judgment in favor of Defendants and deny Plaintiff's summary judgment motion.

## I.
## Background

PDI was an Idaho distributor of ice cream and other frozen foods formed by its owner, Roy Bracken approximately 20 years ago.  Deposition of Roy L. Bracken ("Bracken Depo."), 8:13-24.  In accordance with his business plan, Bracken bought ice cream and other frozen foods from processors as a wholesale buyer and would sell finished products to retail merchants.  Bracken Aff. ¶ 2.  Initially, Bracken operated PDI as a successful business and cultivated successful business relationships with both vendors and customers.

In 2001, Albertsons, Inc. approached Bracken with a business proposal, which suggested that Bracken build a much larger frozen food warehouse for his business.  As part of the business plan, Albertsons would rent a substantial part of the warehouse to support is Boise ice cream manufacturing facility, and would employ PDI to transport its product from the warehouse to the manufacturing facility.  Bracken Aff. ¶ ¶ 3-4.  Bracken agreed Albertsons' proposal would

benefit his business and, subsequently, built a warehouse, forming a separate company (RJB, Inc.).  In addition, he borrowed the construction costs from Key Bank, who also financed PDI's existing operations.  *Id.* at ¶ 5.

After the RJB warehouse was completed in late 2001, Albertsons proceeded to rent the warehouse and PDI's delivery service in accordance with the agreement, which provided the money to service the debt on RJB's construction loan and to augment the growth of PDI's business.  *Id.*  In September 2003, Albertsons was forced to abruptly cancel all commitments made to RJB, PDI, and Bracken with very little notice.  *Id.* at ¶ 6.

Without the revenue from Albertsons, PDI could not maintain an adequate cash flow, making it impossible for either RJB or PDI to service the debt owed to KeyBank and to pay PDI's vendors.  *Id.* at ¶ 7.  As a result, PDI struggled to pay all of its vendors.  *Id.* at ¶ 9.  The vendors accepted PDI tardiness in paying as the status quo, but began requiring that PDI pay its previous invoices before they would ship addition orders as part of what they considered a prudent credit practice.  *Id.* at 8; *see also* Affidavits of Bruggman, Parker, and Stargardt.

KeyBank also became alarmed by PDI's financial crisis and began implementing a plan to collect the loans, which resulted in the commencement of foreclosure actions and the exercise of other contractual remedies.  Bracken Aff. ¶ 9.  Bracken entered into various agreements with KeyBank to the effect that PDI would collect its accounts receivable and continue to pay them to KeyBank to be applied PDI's loan balances.  *Id.*  Eventually, because Bracken failed to perform on his agreements, KeyBank opted to exercise its right to setoff against PDI's checking account at KeyBank.  *Id.* at 10.

According to Bracken, he remained in frequent contact with PDI's principal vendors, and advised at least three of Defendants of the struggles PDI was experiencing in paying its overdue accounts. *Id.* at 11.  Bracken was able to negotiate with them to obtain additional product and further defer payment on product already received.  *Id.*  When KeyBank's actions against PDI culminated in the setoff against its bank account, Bracken advised the vendors that KeyBank had "frozen" PDI's account.

Bracken, however, did not give up his efforts to remain in the ice cream business.  *Id.* at 12.  Instead, he initiated a business relationship with two new partners, Larry Sirhall and James Hawkins, who all collaborated to form Penguin LLC ("Penguin").  *Id.*  The three men organized Penguin to conduct exactly the same business that PDI had conducted.  *Id.*  Penguin even relied upon the same customer base and vendors, placing orders with each of the four Defendants to have the product shipped to Penguin at its new address. *Id.* at ¶ 13.  Each of the Defendants advised Penguin that they would not ship the product until PDI's delinquent invoices were paid. *Id.* at ¶ 14.

In order to pay these delinquent accounts,  Bracken opened a new account at Malheur Federal Credit Union in Ontario, Oregon (the "Malheur" account) in PDI's name and Bracken began depositing the proceeds of PDI's accounts receivable into the Malheur account, rather than paying the proceeds to KeyBank.  *Id.* at 15-18.  Bracken also transferred all of PDI's inventory to Penguin.  *Id.* at ¶ 19.  At Bracken's direction, his counsel prepared an inventory purchase agreement between PDI and Penguin, together with a promissory note from Penguin to PDI, which Bracken signed on behalf of Penguin.  *Id.* at ¶ 15.  Bracken then signed a Bill of Sale conveying PDI's inventory to Penguin and signed the document on behalf of PDI.  *Id.*  Bracken

repaid Penguin's promissory note to PDI using the proceeds of the inventory.  *Id.* at ¶ 16.

Bracken deposited these funds, which amounted to $100,000, from the repayment of the

promissory note in the Malheur account.  *Id.*  Bracken also deposited proceeds he received from

other buyers into the Malheur account.  Condor Aff. ¶ 7 (b)-(c).  Between April 13, 2005 and

April 20, 2005, Bracken deposited a total sum of $148,004.72.  Of that amount, all but $1,208.65

constitutes the proceeds of accounts receivable owed to PDI in which KeyBank held a valid

perfected security interest

       Out of the $148,004.72 , Bracken paid $20,523.12 on April 12, 2004 to Defendant Ruiz

Food Products from the Malheur account.  Similarly, Bracken wired $ 22,667.42 and $39,005.85

to Defendants Oregon Ice Cream and Wells Dairy respectively.  *Id.*  Finally, Bracken developed

sufficient funds to pay Good Humor-Breyers (Conopco) in the amount of $ 70,545,84. When PDI

effected payment of the delinquent accounts to Defendants, each of them filled and shipped orders

to Penguin that Bracken had previously submitted.  *Id.* at ¶ 18.

       Upon learning of the transfer of proceeds of inventory in which it held a first priority

security interest, KeyBank immediately made demands for the return of the payments made to

each of the four Defendants.  KeyBank claims those proceeds were owed to it.  It filed this action

in order to recover those payments made to Defendants based on its security interest.  KeyBank

claims it was unaware that Bracken had formed Penguin, the opening of the Malheur account, or

the plan to transfer all of PDI's business relationships to Penguin.  Bracken Aff. ¶ 15.  KeyBank

believes, and Bracken essentially admitted in his deposition, that he created the Malheur account

for the express purpose of cleansing or eliminating KeyBank's security interest in PDI's accounts

receivable in order to satisfy the demand for payment by Defendants.  Bracken Depo., pp. 112-113.

Defendants deny that they wrongfully received those funds paid to them by PDI. Defendants maintain they only knew that KeyBank had "frozen" PDI's account; that PDI was often late in payments; that Penguin was a new name of PDI or a related new company with new investors; and that Bracken promised to pay past due invoices prior to any new invoices being shipped either to PDI or Penguin.  This dispute has engendered the cross-motions for summary judgment which are the subject of this decision.

## II.
## Standard

When reviewing a motion for summary judgment, the proper inquiry is whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c) (1993).  A moving party who does not bear the burden of proof at trial may show that no genuine issue of material fact remains by demonstrating that "there is an absence of evidence to support the non-moving party's case." *Celotex Corp v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  Once the moving party meets the requirement of Rule 56 by either showing that no genuine issue of material fact remains or that there is an absence of evidence to support the non-moving party's case, the burden shifts to the party resisting the motion who "must set forth specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  It is not enough for the [non-moving] party to "rest on mere allegations of denials of his pleadings."  *Id.*  Genuine factual issues must exist that "can be

resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250.

"When determining if a genuine factual issue . . . exists, . . . a trial judge must bear in mind the actual quantum and quality of proof necessary to support liability." *Id*. at 249-250. "The mere existence of a scintilla of evidence in support of the [defendant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [defendants]." *Id.*

The Ninth Circuit has consistently applied the standard for granting summary judgment. *Musick v. Burke*, 913 F.2d 1390 (9th Cir. 1990); *Pelletier v. Federal Home Loan Bank*, 968 F.2d 865 (9th Cir. 1992); *Bieghler v. Kleppe*, 633 F.2d 531 (9th Cir. 1980).

In determining whether a material fact exists, facts and inferences must be viewed most favorably to the non-moving party.  To deny the motion, the Court need only conclude that a result other than that proposed by the moving party is possible under the facts and applicable law. *Aronsen v. Crown Zellerbach*, 662 F.2d 584, 591 (9th. Cir. 1981).

The Ninth Circuit has recently emphasized that summary judgment may not be avoided merely because there is some purported factual dispute, but only when there is a "genuine issue of material fact." *Hanon v. Dataproducts Corp*., 976 F.2d 497 (9th Cir. 1992).

> In order to withstand a motion for summary judgment, the non-moving party (1) must make a showing sufficient to establish a genuine issue of fact with respect to any element for which it bears the burden of proof; (2) must show that there is an issue that may reasonably be resolved in favor of either party; and (3) must come forward with more persuasive evidence than would otherwise be necessary when the factual context makes the non-moving party's claim implausible.

*British Motor Car Distrib. Ltd. v. San Francisco Automotive Indus. Welfare Fund*, 882 F.2d 371 (9th Cir. 1989).

**III.**
**Discussion**

KeyBank contends it has maintained a perfected security interest in PDI's inventory in accordance with Article 9 of the Uniform Commercial Code ("Article 9"), and specifically Idaho Code Section 28-9-203.[1]  Furthermore, KeyBank asserts its security interest continues in the proceeds from the sale of the inventory as Idaho Code Section 28-9-315 provides, "a security interest continues...in any identifiable proceeds."  KeyBank has submitted evidence demonstrating the veracity of this assertion, which Defendants do not meaningfully dispute.

Assuming KeyBank has a valid and perfected security interest in the proceeds from the sale of PDI's inventory this would seem to conclude the matter as KeyBank would be entitled to the money under Article 9, and specifically, Idaho Code Section 28-9-315, which gives the "secured party, upon a debtor's default priority over anyone, anywhere, anyhow' except as provided by the remaining priority rules." *Citizens National Bank of Whitley County v. Mid-States Development Company, Inc.,* 380 N.E.2d 1243,  (Ind. 1978) (internal quotations omitted). However, Defendants assert that Idaho Code Section 28-9-332(b), which provides that "[a] transferee of funds from a deposit account takes the funds free of a security interest in the deposit account,"  protects them from KeyBank's security interest as PDI paid Defendants for the inventory they supplied from funds held in PDI's bank account, thereby making Defendants "transferees of funds from a deposit account."

---

[1] Idaho Code Section 28-9-203 provides that a security interest in inventory or proceeds becomes enforceable when "(1) value has been given; (2) the debtor has the rights to the collateral or the power to transfer rights in the collateral to a secured party; and (3)...the debtor has authenticated a security agreement that provides a description of the collateral..."

**Memorandum Decision and Order - Page 8**

Defendants' argument hinges on whether § 28-9-332(b) applies when the creditor claims a security interest in the cash proceeds deposited in the account rather than a security interest in the deposit account itself.  KeyBank maintains that § 28-9-332(b) only protects a transferee of funds from a deposit account when the creditor claiming the priority security interest has attached its interest to the deposit account itself, while Defendants suggest that § 28-9-332(b) provides an "ironclad defense" to KeyBank's claim to the funds regardless of whether the creditor holds a security interest in the cash proceeds or the deposit account.  Framing the issue more broadly, this case requires the Court to assess the relative rights of a secured creditor to the proceeds of its collateral and of a third party to whom the debtor transfers those proceeds.

As very little case law seems to exist regarding this particular issue, both KeyBank and Defendants refer the Court to the legislative history of Article 9, comments to the Idaho Code applying to commercial transactions, and other policy arguments.  Sound commercial policy considerations can be marshaled in support of both the rights of the secured part and the rights of the transferee.

### A. Idaho Code Section 28-9-332 (b)

Nothing on the face of § 28-9-332 explicitly limits its scope to transferees of funds from only those deposit accounts encumbered by a security interest and not those accounts which contained proceeds.  Yet, as KeyBank notes, if the Defendants' interpretation is correct, this would create the somewhat anomalous situation where a debtor could defeat a creditor's perfected security interest in proceeds by simply dumping the proceeds in an unencumbered deposit account and transferring them to another creditor, thereby affording the transferee the opportunity

**Memorandum Decision and Order - Page 9**

"to bootstrap himself into priority over a creditor with an otherwise superior secured interest." *See Linn Co-Op. Oil v. Norwest Bank Marion*, 414 N.W. 2d 497, 499 (Iowa 1989) (internal quotations and citations omitted).  Such a result seems to contravene the dictates of Article 9, which were promulgated to ensure that a secured party would be able to rely on its compliance with the U.C.C.'s requirements for perfection and its search of the public recording system to protect its interests as against an unsecured creditor.  Otherwise, to require secured parties to take steps beyond those specified in Article 9 to protect their interests can "undercut[] significant values of certainty, efficiency" and "tend[] to curtail commercial practice and business operation." *Citizens National Bank,* 380 N.E.2d 1243,  (Ind. 1978) .

Nonetheless, the drafters of Article 9 recognized that it is necessary to balance the interests of the secured creditor against the interests of an innocent transferees of cash proceeds, and despite valid concerns for the secured creditor, an interest in ensuring the free flow of funds and in ensuring the finality of a completed transaction, trumps the interests of a secured creditor. Although KeyBank makes a valiant effort to convince the Court that Article 9 does not apply to transfers of cash proceeds of secured inventory from a deposit account, the legislative history and comments to the former Article 9, and even more so with respect to the Revised Article 9, suggest otherwise.

### B. Revision of Article 9

Before the revision of Article 9 in 2000, those parties who had received payments from encumbered proceeds from the debtors bank account asserted their right to take the money free of any security interest based on U.C.C. § 9-306 Comment 2(c), which allowed a recipient of cash proceeds that had been deposited into the debtor's checking account and "paid out in the

operation of the debtor's business" to take free of any claim which the secured party may have

claimed in the proceeds.  Comment 2(c) seemed to indicate that the drafters understood that the

U.C.C. would not displace the common law negotiability of money or cash proceeds.  Many

courts agreed.

For example, in *Textron Financial Corp. v. Firstar Bank Wisconsin*, a debtor sold

collateral in which a secured party had a security interest, and deposited the cash proceeds of the

sale into a deposit account.  Later, with the consent of the debtor, the depositary bank applied the

funds in the account to an amount the debtor owed the depositary bank. The court applied,

Official Comment 2(c),to permit the depositary bank to retain the proceeds as an "ordinary

course" transferee of the money.  The court properly held that a transferee could use the

"ordinary course" exception to the enforceability of a security interest in the proceeds, if the

debtor made the payment "in the operation of the debtor's business" to a payee without

knowledge and was "not reckless about whether the payment violated a third party's security

interest."

Yet, not all courts reached the same conclusion, finding that innocent transferees did not

take free from any security interest in proceeds coming from a deposit account if the proceeds

were "identifiable proceeds" as defined in the Code.  The courts reaching this conclusion,

reasoned that Comment 2 could not be directly tied to any statutory provision in the Uniform

Commercial Code and, in fact, ran afoul of some of the statutory language in the Code.  *See, e.g.,*

*Linn Cooperative Oil Co. v. Norwest Bank Marion*, 444 N.W.2d 497; *HCC Credit Corp. v.*

*Spring Valley Bank & Trust,* 712 N.E.2d 952.

Thus, in response to some of this caselaw that had arisen under Comment 2(c), the PEB Report recommended the revision of the official comments to make the understanding explicit that innocent transferees take free from any security interest in proceeds coming from a deposit account:

> The official comments to§ 9-306 should be revised to reflect that Article 9 does not displace non-UCC rules of negotiability and finality of payment that otherwise would apply to cash proceeds and funds paid from a deposit account constituting proceeds. The revised comments should indicate that a good faith purchaser of cash proceeds or of funds transferred or paid from a deposit account constituting cash proceeds takes free of security interests to the same extent that the purchaser would take free of other competing claims.

PEB REPORT, supra note 15, at 120.

Rather than merely revising the comments, the drafters sought to include Comment 2(c) as a statutory provision.  Other secondary sources confirm that the Revised Article 9 generally reaches the same result as Comment 2 under U.C.C. 9-332(b).  *U.C.C. Article 9: Personal Property Secured Transactions*, 54 Bus. Law. 1935(August 1999)("Revised Article 9 generally reaches the same result [as Comment 2(c)], protecting a transferee of money from an account unless the transferee acts in "collusion" with the debtor to violate the rights of the secured party claiming a security interest <u>in the money</u> in the deposit account.")(emphasis added); SA80 ALI-ABA 237 ("Transferee of funds from a deposit account...would take those funds free of a security interest in the deposit account, and (in a departure from some caselaw that has arisen under comment 2(c) to § 9-302) <u>free of a security interest in the collateral of which the funds were proceeds</u> (emphasis added); *HCC Credit Corp.*, 712 N.E.2d at 956 (noting that drafters of the Revised Article 9 intended to codify a broad reading of comment 2, adding a new section

providing that "transferee of funds from a deposit account takes the funds free of a security interest").

These preliminary comments, and the language in Comment 2(c) of the former version, strongly evince the drafters' intent that U.C.C. § 9-332 allow transferees from a deposit account to take free of a security interest in the collateral of which the funds were proceeds. Furthermore, the official comments to the revision only bolster this conclusion, which provide in part that Section § 28-9-332 provides "[b]road protections for transferees...to ensure that security interests in deposit accounts do not impair the free flow of funds." Comment 3 to Idaho Code § 28-9-332 (2001). This section further emphasizes the value of finality arising from a completed transactions, stating, "[t]he opportunity to upset a completed transaction, or even to place a completed transaction in jeopardy by bringing suit against the transferee of funds, should be severely limited." *Id.*

Therefore, the Court concludes that an innocent transferee takes funds transferred from a deposit account free of a security interest in the collateral of which the funds were proceeds. Accordingly, the Court finds that KeyBank is not entitled to trace the proceeds beyond the Malheur account to Defendant Suppliers. If KeyBank had become aware of the Malheur account, and the proceeds contained therein, <u>before</u> the funds had been transferred out of the account, then KeyBank would have been entitled to recover the proceeds. However, absent a showing of collusion,[2] an interest in not disturbing the finality of a completed transaction trumps the interest a secured creditor may have in tracing proceeds from secured inventory through a

---

[2]KeyBank's argument focuses on the inapplicability of Section § 28-9-332 to this situation. Although, it does allude to the possibility that Defendants colluded with Bracken to deprive KeyBank of its security interest. The Court does not find sufficient evidence in the record to sustain such a claim.

**Memorandum Decision and Order - Page 13**

checking account into the hands of a supplier.  As the facts now stand, KeyBank's only remedy is against PDI and, possibly, Mr. Bracken.

## ORDER

Based on the foregoing, the Court being otherwise fully advised in the premises, **IT IS HEREBY ORDERED that:**

1) Defendants' Motion for Summary Judgment (Docket No. 24), filed May 25, 2005, is GRANTED.

2) KeyBanks' Motion for Summary Judgment (Docket No. 31), filed on May 25, 2005, is DENIED.

DATED: September 9, 2005

Honorable Mikel H. Williams
United States Magistrate Judge